·**Jack LEAF and Marvin Gunnufson, Plaintiffs-Appellees and Cross-Appellants,**

**v.**

**UNITED STATES of America, Defendant-Appellant and Cross-Appellee.**

**Nos. 79–3831, 80–5013.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 5, 1981.

Decided Nov. 16, 1981.

Kenneth L. Crowder, Engstrom, Lipscomb & Lack, Los Angeles, Cal., argued, for Leaf & Gunnufson; Walter J. Lack, & Marylin Jenkins White, Los Angeles, Cal., on brief.

Susan Sleater, Dept. of Justice, Washington, D. C., for United States.

Before CHAMBERS and ANDERSON, Circuit Judges, and BILBY,* District Judge.

* The Honorable Richard M. Bilby, United States District Judge for the District of Arizona, sitting by designation.

CHAMBERS, Circuit Judge:

The government appeals from a judgment awarding damages to plaintiffs in the amount of $150,000, for the destruction of their PBY aircraft while it was being used by a DEA informant named Morris Bean, with the knowledge and approval of the DEA agents assigned to supervise him. The government claims that, contrary to the trial judge's findings, Bean was not an "agent" of the government so as to impose respondeat superior liability on the government.

The record discloses a man who is not the run-of-the-mill informant who is used to buy and sell drugs, generally out of fear of arrest or prosecution if he does not cooperate with the government. Bean, rather accurately, describes himself as a "Walter Mitty" type who was excited by the prospect of adventure and offered his services as a citizen; he was under no threat of criminal prosecution. Moreover, he tells of drug-related problems in people close to him which led him to enter the battle against the drug traffic. By profession he rebuilt helicopters, he had a private pilot's license, and he had contacts with others in the aircraft trade. Presumably, because of this he was sought out by drug smugglers.

Having worked already on one smuggling case with the DEA, Bean was enthusiastic about further covert activity. When another smuggler sought his assistance, he reported the conversation to the DEA agents supervising him and, with their approval, he threw himself into the new adventure. With the full knowledge and approval of his supervisors, he suggested to the drug smuggler that a PBY aircraft should be obtained because of its flexibility in landing on both land and water. Then, still with his supervisors' knowledge and approval, he suggested to the smuggler that he knew of such a PBY (i. e., the plaintiffs'); in order to entice them to purchase it he intentionally overstated its load-bearing capacity, he introduced the smuggler to the plaintiffs, he gave the plaintiffs a totally false story that the plane was to be used by a rock music group for recreational purposes, he never told the plaintiffs of its true intended use,

he participated in drawing up a lease to permit the smuggler to test the plane prior to purchase, he signed the lease as agent of the smuggler, he co-piloted the plane from California to Arizona, and registered the plane under his own name at the Phoenix airport. He also co-piloted the leased plane on a "test run" to Mexico which turned out to be the "real thing". Armed Mexicans arrived to load the plane with bales of marijuana. It was overloaded and was damaged in an abortive take-off, the cargo was jettisoned, and the plane was then scuttled as Bean and his companions fled to avoid capture by the Mexican authorities.

The government argues that Bean was a "volunteer" in the strict sense of the word and that his activities, and the resulting damage, could not be imputed to the government. Cases are cited which arose in significantly different factual settings, e. g., *Slagle v. United States*, 612 F.2d 1157 (9th Cir. 1980), involving a routine drug informant engaged in a drug sale. The district judge rejected the government's defense on this issue and found that an agency relationship existed. Another trier of fact might have come to a different result, but this trier of fact found agency and we cannot say the record does not support him.

Our difficulty with the case is not so much on the issue of agency. It is on the question of the statutory limitations on government tort liability found in 28 U.S.C. § 2680(h), the so-called "misrepresentation exception" which precludes relief under the Tort Claims Act for, "Any claim arising out of . . . misrepresentation . . . ."

Plaintiffs have attempted to cast their complaint in words of negligence related to the obtaining of the custody of the PBY aircraft. It alleges that pursuant to a plan:

"proposed, discussed, approved, funded, controlled and implemented by agents of the Drug Enforcement Administration, Plaintiffs were persuaded to voluntarily give custody of the aircraft to Defendants . . . ."

The complaint also alleges, inter alia, that the defendants' negligence included:

"Failure to exercise reasonable care in disclosing to Plaintiffs the true intended

uses contemplated by Defendants for the aircraft in question."

The district judge's findings indicate how basic to the plaintiffs' case was the failure of Bean or the DEA agents to advise the plaintiff-lessors of the intended use of their plane. Finding No. 4 states: "At no time prior to the destruction of the PBY did BEAN, or any agent of the DEA, inform plaintiffs LEAF and/or GUNNUFSON of the true use to which the PBY was to be put." Finding No. 6 states that the "true purpose of BEAN in obtaining possession of the PBY was to fly a simulated drug run mission into and out of Mexico . . . ." Finding No. 9 states that the agents supervising Bean's activities were aware when they authorized the Mexican mission "of the prior loss and destruction of two other aircraft in Mexico by the prime suspect involved in the simulated drug-running mission . . . and of the generally great risk to persons and property involved in drug-related activity in Mexico." Finding No. 14 states that the DEA and Bean were negligent in several particulars, among which were: "(3) Failing to advise the plaintiffs of the true purpose and circumstances of the flight"; and of "(5) Failure to advise Leaf and Gunnufson of the purpose and use to which they, at all times, planned its [the PBY's] use and purpose."

The misrepresentation exception to the Tort Claims Act:

"... precludes liability where the plaintiff suffers economic loss as a result of a commercial decision which was based on a misrepresentation by government consisting either of false statements or a failure to provide information which it had a duty to provide." Green v. United States, 629 F.2d 581 (9th Cir. 1980).

In this case there was misrepresentation as to the intended use of the aircraft when it was leased from plaintiffs. It is clear that misrepresentation is an issue at the heart of plaintiffs' complaint, however deftly they have attempted to avoid using the word. Bean's admittedly intentional misrepresentations to plaintiffs were clearly within the chain of causative events upon which plaintiffs' claim is founded, and thus within the misrepresentation exception. *Redmond v. United States*, 518 F.2d 811, 814–816 (7th Cir. 1975). Put another way, misrepresentation was definitely a significant factor relied upon by plaintiffs in maintaining their suit, and the suit is therefore barred by the misrepresentation exception stated in 28 U.S.C. § 2680(h). *Bor-Son Bldg. Corp. v. Heller*, 572 F.2d 174 (8th Cir. 1978).

We cannot condone the activity of the government, either through the informer or the agents supervising his activities. But the plaintiffs claim damages resulting from a commercial decision to lease their aircraft, based on misrepresentations of a government agent. The government has not consented to be sued for such damages; the exception of Section 2680(h) applies to bar any recovery by the plaintiffs under the Tort Claims Act.

In view of this disposition of the appeal from the judgment, we do not reach the damages issue raised in plaintiffs' cross-complaint.

REVERSED.